Opinion issued August 10, 2023



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-22-00530-CR

———————————

**EVAN MICHAEL SZARF, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case No. 19208**

---

## MEMORANDUM OPINION

Appellant Evan Michael Szarf was charged in a two-count indictment with assaulting his girlfriend. In Count 1, he was charged with Family Violence on a Household Member by Impeding Breath or Circulation with a Previous Conviction, a second-degree felony, and in Count 2, he was charged with Assault

Family Violence of a Family or Household Member with a Previous Conviction, a third-degree felony. Appellant pleaded not guilty. Following a bifurcated bench trial, the trial court found Appellant guilty on both counts and sentenced him to ten years' confinement and five years' confinement, respectively, in the Institutional Division of the Texas Department of Criminal Justice. The sentences are to run concurrently.

Appellant appeals from his conviction under Count 1.[1] In four issues, he argues (1) the evidence is insufficient to prove he committed Family Violence on a Household Member by Impeding Breath or Circulation, (2) the evidence is insufficient to prove he was previously convicted of a family offense; and (3)-(4) the final judgment incorrectly recites the degree of the offenses for which he was convicted under Counts 1 and 2.

We affirm the trial court's judgment as reformed.

## Background

Appellant Even Michael Szarf ("Szarf") and his girlfriend Amanda Breitenbach ("Amanda") lived together at a residence in Washington County. The

---

[1] Appellant does not appeal from his conviction under Count 2, but as noted, he seeks reformation of the final judgment to reflect the proper degree of the offenses for which he was charged. As it concerns Count 2, Appellant claims, and the State concedes, that the final judgment incorrectly states he was convicted of a second-degree felony and should be corrected to reflect he was convicted of a *third-degree felony* for Assault Family Violence of a Family or Household Member with a Previous Conviction.

morning of October 29, 2020, they got into a heated argument and a physical altercation ensued. Amanda called 911 crying and complaining of a "bloody nose" and "a few punches and bites on [her] body."

Two deputies and a sergeant from the Washington County Sheriff's Office were dispatched to the house. They knocked on the front door. After a few minutes, Szarf emerged from the house and stepped outside. Szarf told the police he and Amanda had gotten into a heated argument and he struck Amanda with an open hand. Amanda also told the officers that Szarf had hit her and choked her with a sock. The officers took photographs of Amanda's injuries and called emergency medical services ("EMS") to evaluate Amanda.

The officers arrested Szarf. He was charged with the second-degree felony of Family Violence on a Household Member by Impeding Breath or Circulation with a Previous Conviction under Section 22.01(b-3) of the Texas Penal Code ("Count 1"), and the third-degree felony of Assault Family Violence of a Family or Household Member with a Previous Conviction under Section 22.01(b) ("Count 2"). Both counts were enhanced in a separate document with Szarf's prior felony DWI conviction.

**The Trial**

Szarf pleaded not guilty to the two assault charges. He waived his right to a jury trial and the trial judge conducted a bifurcated bench trial on the two Counts.

3

## A.     The 911 Call

The morning of October 29, 2020, Amanda called 911 crying and complaining of a "bloody nose" and "a few punches and bites on [her] body." Amanda told the 911 dispatcher she was calling about a "domestic violence issue." She stated she was the only one injured and told the dispatcher she was not sure whether she needed EMS because she had "a bloody nose and [she] had a few punches and bites on [her] body." The State offered the 911 call into evidence as State Exhibit 1.

During the 911 call, Amanda is heard crying. She tells the dispatcher she is outside the home and Szarf, who is inside, knows she is calling. She then starts crying and at some point, states "here he comes." The dispatcher tells her he will stay with her on the call until the authorities arrive. Shortly after, Amanda is heard screaming and the call cuts off.

## B.     Deputy Luis Pizarro

Deputy Luiz Pizarro ("Deputy Pizarro"), a Washington County Sheriff's Office patrol officer, testified that he responded to a call on October 29, 2020 at approximately 10 a.m. He was told there was an assault and a female had been hit. Deputy Pizarro, Deputy Joshua Martinez ("Deputy Martinez"), and Sergeant Guillermo Guerrero ("Sergeant Guerrero") responded to the call. When Deputy Pizarro and Sergeant Guerrero arrived at the residence, Deputy Pizarro knocked on

4

the door and Szarf eventually came out. He testified Szarf was not combative or resistant. Szarf stated he and Amanda "got in an argument and things got heated."

Deputy Pizarro testified he was wearing a body camera on the day of the incident. A redacted version of his body camera recording was admitted into evidence as State Exhibit 3. Deputy Pizarro testified that after the video stopped, he handcuffed Szarf and put him in the back of his marked patrol car. At some point after, Amanda came within Szarf's line of vision, and Szarf told her he was "sorry." [2]

Deputy Pizarro spoke with Amanda. He testified she was "crying, shaky . . . scared." According to Deputy Pizarro, Amanda appeared to be injured. She had a "red substance on her face that appeared to be blood . . . with mucus[.]" Amanda's "[e]yes were puffy" and "she had some . . . scratches on her neck[.]" She also had red markings on her face, neck, and cheek. Amanda told Deputy Pizarro that Szarf "wrapped a sock around her neck and choked her." Deputy Pizarro testified that Amanda's injuries were consistent with what Amanda described during her 911

---

[2] State Exhibit 3 was admitted, by agreement of the parties, with several redactions. It is unclear what the extent of those agreed redactions were and whether the State Exhibit 3 that was filed in the record of this Court is the same redacted exhibit that was offered at trial. The State Exhibit 3 in this Court's record begins with Deputy Pizarro knocking on the front entrance of the residence and ends when he places Szarf under arrest and handcuffs him. Although Deputy Pizarro testified at trial that right after he also spoke to Amanda, and the State in its appellate brief references the body camera video reflecting Deputy Pizarro's conversation with Amanda, the State Exhibit 3 in this Court's record does not reflect such conversation between Amanda and Deputy Pizarro.

call. Amanda received medical treatment from EMS on the scene, but she refused further evaluation at a hospital or clinic. She told EMS she did not want to go to the hospital.

Deputy Pizarro went inside the house. He testified he saw clutter and what appeared to be blood droplets on the floor near the door. According to Deputy Pizarro's report, Amanda had bruising on her neck and the bruising was indicative of strangulation. Deputy Pizarro arrested Szarf for occlusion assault and possession of a controlled substance.[3] He testified that his decision to arrest Szarf for occlusion assault was based on his observation of Amanda's injuries as well as the injuries she described during the 911 call. He testified his conclusion that Amanda had been strangled stemmed from the markings on her neck and her statement to him that Szarf "wrapped a sock around her neck and choked her." Deputy Pizarro was able to identify Szarf on the scene based on Szarf's name and date of birth.

## C. Deputy Martinez

Deputy Martinez of the Washington County Sheriff's Office testified he was dispatched to a disturbance reported by a female caller who stated that "she was assaulted by her boyfriend, that she was hit, and she was bleeding from the nose." When he arrived at the residence, Deputy Martinez walked around to the back of

---

[3] Szarf pleaded guilty to the drug charge, and that charge is not before this Court.

6

the house while Deputies Guerrero and Pizarro knocked on the front door. Deputy Martinez saw Amanda sitting on the back porch. "It was cold and windy" and she was not wearing shoes. Her face was bloody, particularly around her nose area. Deputy Martinez and Amanda moved to the front yard, and when she saw Szarf, Amanda began to cry.

Deputy Martinez testified that the injuries he observed were consistent with "some kind of disturbance that led up to some type of an assault." He also noticed that the screen of Amanda's phone was cracked.

## D.    Sergeant Guerrero

Sergeant Guerrero, a patrol sergeant with the Washington County Sheriff's Office, was dispatched to the scene on October 29, 2020 at approximately 9:27 a.m. When he arrived at the house, Sergeant Guerrero first made contact with Szarf, who was compliant and "not showing a lot of emotion." Szarf provided Deputy Guerrero with his name and date of birth (March 2, 1982). Szarf told Deputy Guerrero that "Amanda had taken something from him that made him mad."

Sergeant Guerrero also saw Amanda at the scene. He testified she was covered in something "like sweat, water, or something as if she'd been thrown on the ground or rolled around[.]" He also saw fresh blood on her face and coming from her nose. She seemed upset, and she was crying. He saw markings on her

7

cheek where Amanda stated she had been bitten, and slight markings around her neck.

**E.     EMS Report**

While at the scene, the officers photographed Amanda's injuries and called EMS to evaluate her. The photographs depict a bloody nose, a round red mark on Amanda's cheek, red marks on her neck, scratches on her neck, and red marks on her upper chest. The EMS report notes that EMS was dispatched to evaluate a woman "involved in an assault." According to the report, Amanda told the EMS crew that Szarf punched her with a closed fist, hit on her on the face, and choked her. The EMS report notes that Amanda had "trauma to her nose," "marks to her neck and scratch marks to her upper chest." It states the patient had "marks to her neck and scratch marks to her upper chest." The report further notes that Amanda "denied transport to the ER for evaluation." The photographs and the EMS report were admitted into evidence as State Exhibits 20-25.

**F.     Amanda Hazelwood[4]**

While Amanda consistently told the 911 call dispatcher, the responding officers, and the evaluating EMS personnel that Szarf had assaulted her by punching her with a closed fist and choking her, she recanted her testimony at trial. At trial, Amanda testified she was the aggressor during the argument. She testified

---

[4]     Amanda Hazelwood went by the name Amanda Breitenbach when the assault occurred. She was subpoenaed to appear in court.

8

she threw things at Szarf, that he accidentally hit her while acting in self-defense, and that he did not bite her, strangle her, or intentionally strike her.

Amanda testified that Szarf is her boyfriend and they have been together three years. On October 29, 2020, they got into an argument and she began to yell and throw kitchen utensils and plates at Szarf. She testified she was angry because he had not slept in their bed the night before. Amanda explained that although they argued sometimes, this was the first time she ever threw anything at Szarf and he was shocked when it happened.

After Szarf and Amanda started to yell, she "kept getting in his face." She pushed him backwards until he was backed up against the wall. She testified that he put his hands up to try to stop her and he accidentally hit her in the nose. Amanda testified Szarf had an open hand when he hit her, which was sort of a "get back" push. She testified that she "freaked out" and kept yelling at him. She grabbed her phone and called her sister, who told Amanda to call 911.

Amanda told the 911 dispatcher that Szarf had attacked her. While still on the phone with the 911 dispatcher, Szarf came outside the house and yelled at her, but he did not know she was on the phone with 911. She testified she could not recall anything happening while she was on the 911 call that would have made her scream. She remained on the back porch until the authorities arrived.

9

Amanda testified that Szarf did not try to strangle her with a sock, even though she acknowledged that she previously told the responding officers at the scene that he did. She testified that she claimed that Szarf had strangled her because she was mad at Szarf and because she was scared and confused. She testified she had not gotten much sleep the night before, and when she called 911, she was "confused about the situation." Amanda acknowledged, however, that on the day of the incident, she told several people that he had tried to strangle her: the three officers who responded to the dispatch and the two paramedics who evaluated her.

Amanda also testified she did not recall having been bitten or telling the officers that Szarf bit her. She did not think Szarf bit her on the face. She conceded Szarf did strike her in the face, however. Amanda testified that she was confused because of "the adrenaline of us arguing and then getting in the fight." She testified that she was embarrassed to have acted that way.

Amanda testified she called 911 to make the argument stop. She knew law enforcement would come and Szarf would probably get in trouble. She did not recall whether she told the officers that her injuries stemmed from an accident. She conceded that after the incident, she did not tell anyone that her injuries were the result of an accident. She denied that the wound on her face was caused by Szarf trying to bite her. She did not recall being hit in the eye. According to

10

Amanda, Szarf only hit her once the day of the 911 call and that was an accident. She did not recall telling EMS that Szarf kicked her and testified that in fact, he did not kick her. When the police heard Szarf tell Amanda he was sorry, she testified it was because they had gotten into an argument.

Amanda testified that the redness and bruising below her collarbone were caused by her suicide attempt the day before, when she put a curtain around her neck and tied it to a sheet rack. She testified her suicide attempt did not work because Szarf cut the curtain. She testified she has a history of suicide attempts. She testified she told the officers that some of the marks they were photographing resulted from self-inflicted injuries. Amanda also testified that some of the other injuries depicted on the photographs were preexisting injuries from a fall in the house a few days prior.

Amanda explained that her reaction on the day of the assault may have been exaggerated because of "lack of sleep, partying all night." She testified that the night before the assault, she and Szarf drank and used methamphetamines together. She testified she lied to the police about the assault because she was mad at Szarf for not sleeping in bed with her. She wanted Szarf to get in trouble but did not realize the amount of trouble he would get into. She testified she was scared she would get in trouble with the police because she was the one who had started the fight. Amanda testified that she and Szarf had argued before but she believed this

11

fight was the first time she had gotten physically aggressive toward him. She testified she had been the "first aggressor" in arguments with Szarf "too many [times] to count."

**G.    Crystal Conner**

Crystal Conner ("Conner") is a forensic nurse at Baylor Scott & White Hospital in College Station, Texas. Forensic nurses take care of patients who have been assaulted, "be it a sexual assault, abuse, domestic violence, strangulation." Conner has testified before as an expert in strangulation. She testified that it is "very challenging" to take photos of neck injuries. If a sock is used to apply pressure to someone's neck, it is not always the case there will be visible evidence of it, but it can still cause strangulation. She testified that bruising is not common in strangulation. The neck is soft, and when you apply pressure to the neck, "you can either occlude—there's veins, arteries, and your trachea that are in your throat and if you apply pressure, you can—if you're applying pressure to the veins or the arteries, you decrease the blood flow and that can cause a wider range of problems, such as dizziness, loss of consciousness, tingling, things along those lines. Applying pressure to the trachea causes discomfort. It can also cause . . . coughing or difficulty breathing."

Connor testified that memory loss or confusion may result after a strangulation. Alcohol or drug usage also can affect memory or make someone

12

confused. In situations of domestic violence, it is not surprising for the victims to have a difficult time recalling events. It is also common for victims later to change their version of events. She testified she did not interact with Szarf or Amanda or review the evidence in this case.

Szarf did not testify. After arguments of counsel, the trial court found Szarf guilty on Counts 1 and 2 as recited in the indictment. During the punishment phase of trial, the State introduced Szarf's prior felony DWI conviction as an enhancement. Szarf pleaded guilty to the DWI enhancement, increasing the punishment range for the charged offenses to first-degree felony for Count 1 and second-degree felony for Count 2. The trial court sentenced Szarf to ten years' incarceration at the Texas Department of Justice, Institutional Division on Count 1, and five-years' incarceration on Count 2, to run concurrently.

## Discussion

### A    Standard of Review

We apply the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979) in determining whether the evidence is sufficient to support each element of a criminal offense that the state must prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In evaluating the legal sufficiency of the evidence, we defer to the factfinder's credibility and weight determinations. *Id.* at 894. "[W]e view the evidence in the light most

13

favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 895). We consider both direct and circumstantial evidence in our analysis. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases.") (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

The legal-sufficiency standard does not blindly defer to the factfinder's credibility determinations, as "it allows for some consideration of whether the [factfinder's] credibility determinations were rational in light of the objective evidence." *Walker v. State*, Nos. PD-1429-14, PD-1430-14, 2016 WL 6092523, at *15 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication) (citing *Brooks*, 323 S.W.3d at 907). We must presume the finder of fact resolved any evidentiary conflicts in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326; *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally")

14

(quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)). If our review reveals the evidence is legally insufficient, we must reverse the appellant's conviction. *Costilla v. State*, 650 S.W.3d 201, 212 (Tex. App.—Houston [1st Dist.] 2021, no pet.). However, if there are two permissible views of the evidence, "the fact finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

## B.    Applicable Law

A Class A misdemeanor assault occurs when a person "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." TEX. PENAL CODE § 22.01(a)(1), (b). A Class A misdemeanor assault may be enhanced to a third-degree felony if the person commits the offense by "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood" of a family member[5] "by applying pressure to the person's throat or neck or by blocking the person's nose or mouth." TEX. PENAL CODE § 22.01(a)(1), (b)(2)(B). This offense is known as Occlusion Assault.

---

[5]    We use the term "family member" here to mean a "person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005 of the Texas Family Code. *See* TEX. PENAL CODE § 22.01 (b)(2), (b-3); *see also* TEX. FAMILY CODE § 71.0021(b) (dating relationships); *id.* § 71.003 (family members); *id.* § 71.005 (household members). The parties do not dispute that Amanda was a household member and thus a "family member" for purposes of the applicable statute.

Relevant to this appeal, Occlusion Assault may also be enhanced to a second-degree felony if "it is shown on the trial of the offense that the defendant has been previously convicted" of family violence. *Id.* § 22.01(a)(1), (b-3). In such a case, evidence of a prior conviction is an element of the offense.

When proof of a prior conviction is a jurisdictional element of a crime, the fact of the prior conviction, including the identity of the accused, must be proved beyond a reasonable doubt. *Wilmer v. State*, 463 S.W.3d 194, 197 (Tex. App.— Amarillo 2015, no pet.). To establish that the defendant was convicted of that prior offense, the State must prove beyond a reasonable doubt that "(1) a prior conviction exists and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). Texas law does not require that a prior conviction be proven in any specific manner. *Id.* at 922. "Any type of evidence, documentary or testimonial, might suffice." *Id.*

## C.   Occlusion Assault

In his first two issues, Szarf challenges the legal sufficiency of the evidence to support his conviction for Occlusion Assault. In his first issue, he challenges the "impeding" element of the offense, claiming there is insufficient evidence that he "actually impeded the normal breathing or the circulation of the blood of Amanda." In his second issue, Szarf argues the State failed to establish he was previously convicted of a family violence offense, and thus there was insufficient

16

evidence of the enhancement necessary to elevate the charged assault to a second-degree felony.

### 1. Evidence of Impediment

To establish Occlusion Assault, the State must prove beyond a reasonable doubt that Szarf "impeded" Amanda's normal breathing. *McCall v. State*, 635 S.W.3d 261, 267 (Tex. App.—Austin 2021, pet. ref'd) (citing TEX. PENAL CODE § 22.01(a)(1), (b)(2)(B)). The term "impeding," as used in Section 22.01, is not defined. In *Marshall v. State*, 479 S.W.3d 840, 844 (Tex. Crim. App. 2016), the Court of Criminal Appeals defined "impeding" as "[a] hindrance or obstruction." The defendant in *Marshall* covered the complainant's face with a pillow. *Id.* at 842. The complainant was still able to breathe, just not deeply. *Id.* The Court held that because "the plain meaning of the statutory language indicates that any impediment to normal breathing" is sufficient, evidence that the complainant was unable to take deep breaths was sufficient to support the defendant's conviction for Occlusion Assault. *Id.* at 844–45. The Court held that the "jury did not need to find that [the complainant] actually stopped breathing or that she was unconscious." *Id.* at 844. The Court concluded, "An impediment to normal breathing does not necessarily prevent breathing altogether because an impediment is merely a hindrance or obstruction." *Id.* at 845. More recently, relying on *Marshall*, the Court of Criminal Appeals held that:

17

[A]ny hindrance, obstruction, or impediment for any amount of time to one's breathing or blood flow is *per se* a bodily injury and therefore sufficient to satisfy family-violence assault. This is an exceptionally low bar. It takes very little effort or force to slightly hinder another's breathing or circulation, and there is notably no injury or threat of injury requirement aside from the impediment, however minimal.

*Philmon v. State*, 609 S.W.3d 532, 537 (Tex. Crim. App. 2020).

Szarf argues the State's case "is completely lacking any testimony or other evidence" to prove Amanda experienced "actual occlusion," such as difficulty breathing, coughing, or symptoms indicating blood flow impairment. Szarf acknowledges that Amanda told the officers he punched her and choked her with a sock, and that there was "some photographic evidence suggesting that she had bruising and/or abrasions around her neck." He argues, however, that the photographic evidence does not prove Occlusion Assault because there must be evidence that Szarf impeded Amanda's breathing or the circulation of her blood. Szarf asserts that a mere "excited utterance" by Amanda at the scene that Szarf "choked" her without an explanation of the "effects she may have suffered as a result" is not sufficient to prove Occlusion Assault.

The State responds that Amanda "consistently" told law enforcement and medical personnel at the scene "that Appellant wrapped a sock around her neck and choked her." The officers testified that Amanda had red marks and scratches on her neck, blood on her face, puffy eyes, and red markings on her cheek. Photographs of these injuries were admitted into evidence. In addition to

18

Amanda's statements to police and EMS personnel, the 911 call, and the photographs, the State points to Connor's testimony that when you apply pressure to the neck, you can occlude the veins, arteries, and trachea, and that applying pressure to the veins or arteries decreases blood flow.

In reviewing Szarf's first issue, we find *Losoya v. State*, No. 07-17-00061-CR, 2018 WL 5094001 (Tex. App.—Amarillo Oct. 18, 2018, no pet.) (mem. op., not designated for publication) instructive. In *Losoya*, the appellant, having been convicted of Occlusion Assault, contended there was insufficient evidence to support the allegation that he impeded the complainant's normal breathing or circulation of blood. *Id.* at *1. The complainant was the appellant's mother. During trial, the responding officer testified the complainant told him "she was asleep in her bed 'when she was awakened by [appellant] choking her and punching her in the face and the head multiple times.'" *Id.* She was able to get away and call 911. *Id.* The complainant "repeated to a fireman and a paramedic that appellant awakened her by choking and punching her." *Id.* And medical records reflected she "told medical personnel that she had been choked or strangled and had neck pain." *Id.* An officer also "noticed redness on [her] neck, face, and chest area." *Id.* Like Amanda at trial, the complainant in *Losoya* testified she could not remember the night of the assault, and she could not recall being choked. *Id*.

19

The court held that the complainant's prior "statements that appellant choked or strangled her, coupled with the redness on her neck and her neck pain, readily allowed the jury to conclude [appellant impeded her breathing or circulation of blood] by applying pressure to her neck or throat." *Id.* at *3. "The jury was free to believe the testimony of the police officer, the firefighter, and the paramedic rather than what [the complainant] said during her testimony." *Id.* The court also noted the significance of testimony from a nurse offered as a strangulation expert, who "describe[d] the little pressure required to restrict or impede breathing or blood flow," and of the complainant's 911 call, during which she told the dispatcher that appellant had punched her and she was hurting. *Id.* The court held:

> [T]he jury readily could have concluded appellant used significant force during his assault. Considering that evidence, along with the testimony of the redness of her neck, and the pain that she described to medical personnel, we find the jury's conclusion his choking or strangling [the complainant] impeded her normal breathing or blood circulation was a reasonable inference from the facts shown and not mere speculation.

*Id.*

The opinion in *Hennard v. State*, No. 10-14-00324-CR, 2015 WL 5474796 (Tex. App.—Waco Sept. 17, 2015, no pet.) (mem. op., not designated for publication) also is instructive. The complainant in *Hennard* told police that her brother, the appellant, "slapped and choked her in the living room of their home,

20

and then the fight continued in the bedroom where he hit her again and stomped on her." *Id.* at *2. The officers testified that the complainant had redness on her neck and that the redness was consistent with being strangled. *Id.* The complainant, who said she did not want to appear at trial, testified she had taken prescription medication the day of the assault and could not recall what happened that day. *Id.* She testified she did not remember talking to the police or giving a statement. *Id.* Like Amanda in the present trial, the complainant testified that the bruising on her neck may have been self-inflicted, because she previously tried to choke herself. *Id.* She testified that her brother had "never touched her and that he would not hurt her." *Id.* The State introduced photographs showing the injuries on complainant's neck. *Id.* at *3. The court of appeals stated the factfinder "is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties." *Id.* (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The court affirmed the trial court's judgment convicting the appellant of Occlusion Assault. *Id.*

Neither *Losoya* nor *Hennard* included a discussion of whether the complainant's breathing or circulation was actually impeded. To the extent the factfinders inferred such a finding from the evidence, we note that evidence is sufficient to support a conviction if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in

21

the light most favorable to the verdict." *Edward v. State*, 635 S.W.3d 649, 655–56 (Tex. Crim. App. 2021). Moreover, evidence that breathing or blood circulation was impeded is an "exceptionally low bar" because "[i]t takes very little effort or force to slightly hinder another's breathing or circulation[.]" *Philmon*, 609 S.W.3d at 537.

In the present case, the evidence supporting the "impeding" element of Occlusion Assault included Amanda's 911 call, the EMS report, photographs taken on the day of the incident, testimony from the three responding officers reflecting the injuries to Amanda's neck, and Amanda's statements to EMS and the responding offers that Szarf choked her with a sock and hit her with a closed fist.

During the 911 call, Amanda tells the dispatcher she has a "bloody nose" and a "few punches and bites" on her body. Amanda tells the dispatcher she is the only one injured. She is heard crying and screaming at the end of the 911 call. The trial court also heard testimony from Deputy Pizarro that Amanda told him Szarf choked her with a sock, and he saw red marks on her neck. Amanda also acknowledged at trial that she told the three responding officers and the two paramedics who evaluated her that Szarf choked her with a sock. And the EMS report reflects that Amanda told the paramedics Szarf punched her with a closed first, hit her on the face, and choked her. The EMS report notes trauma to the nose,

marks to the neck, and scratch marks on Amanda's upper chest. The photographs also reflect injuries to Amanda's nose, cheek, neck, and upper chest.

Separately, the trial court also heard testimony from the State's strangulation expert that if a sock is used to apply pressure to someone's neck, there will not always be visible evidence, but it can still cause strangulation. She testified that the neck is soft and "you can either occlude—there's veins, arteries, and your trachea that are in your throat and if you apply pressure, you can—if you're applying pressure to the veins or the arteries, you decrease the blood flow and that can cause a wider range of problems, such as dizziness, loss of consciousness, tingling, things along those lines. Applying pressure to the trachea causes discomfort. It can also cause . . . coughing or difficulty breathing."

We hold that Amanda's prior statements that Szarf choked her with a sock, coupled with the redness and scratches on her neck and chest area, her statements and demeanor during the 911 call, and Conner's testimony concerning strangulation together allowed the jury to conclude that Szarf impeded Amanda's breathing or circulation of blood by applying pressure to her neck or throat. While Amanda recanted her testimony at trial and testified she was the aggressor and that Szarf did not bite her, strangle her, or intentionally strike her, the trial court was free to believe the testimony of the police officers and the reports of the paramedics over Amanda's trial testimony.

23

Viewing the record in the light most favorable to the trial court's verdict, we conclude the evidence is sufficient to support Szarf's conviction for Occlusion Assault. We overrule Szarf's first issue.

## 2. Previous Assault Conviction

Count 1 of the indictment charged Szarf with Occlusion Assault. To enhance the offense from a third-degree felony to a second-degree felony, the indictment alleged that Szarf was previously convicted in 2006 of an offense involving family violence. Szarf argues that the evidence is insufficient to prove he was convicted in 2006 of family violence assault, which he argues is a required element of Occlusion Assault as charged in the indictment. Given the insufficiency of the evidence on this point, should we conclude there was sufficient evidence of impediment to support Szarf's conviction for Occlusion Assault under his first issue, Szarf argues we should modify the final judgment to reflect a conviction for Occlusion Assault as a third-degree, rather than second-degree, felony, "affirm the conviction as modified, reverse the punishment, and remand the case to the trial court to conduct a new punishment hearing consistent with the range of punishment for the applicable lower-level offense."[6] The State responds that State Exhibits 9 and 10 sufficiently link Szarf with a 2006 family violence

---

[6] Szarf was sentenced to ten years' imprisonment for Count 1. The imposed sentence falls within the maximum punishment range for a third-degree felony. TEX. PENAL CODE § 12.34.

assault conviction through his unique name, date of birth, gender, race, cause number, court number, and offense.

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that "(1) a prior conviction exists and (2) the defendant is linked to that conviction." *Flowers*, 220 S.W.3d at 921. The trial court must consider whether "the totality of the evidence establishes beyond a reasonable doubt" the link between the defendant and the previous conviction. *Wood v. State*, 486 S.W.3d 583, 589 (Tex. Crim. App. 2016). In *Flowers v. State*, 220 S.W.3d 919 (Tex. Crim. App. 2007), the Texas Court of Criminal Appeals explained that there is no specific document that is required to link a defendant to a prior conviction:

> There is no "best evidence" rule in Texas that requires that the fact of a prior conviction be proven with any document, much less any specific document. While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways, including (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person, or (3) documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted.

*Id.* at 921–22 (internal citations omitted). The Court in *Flowers* likened the evidence required to link the two elements to the pieces of a jigsaw puzzle: "The pieces standing alone usually have little meaning. However, when the pieces are

25

fitted together, they usually form the picture of the person who committed that alleged prior conviction or convictions." *Id.* (citing *Human v. State*, 749 S.W.2d 832, 835–36 (Tex. Crim. App. 1988)). That the defendant is the same person identified in the prior convictions may be established "in a number of different ways." *Flowers*, 220 S.W.3d at 921; *see also Human*, 749 S.W.2d at 836 (noting that circumstantial evidence may be used to prove prior conviction); *Demers v. State*, No. 05-11-01704-CR, 2013 WL 323446, at *2 (Tex. App.—Dallas Jan. 29, 2013, no pet.) (not designated for publication) ("The State may use circumstantial evidence to prove the defendant is the same person named in the prior convictions.").

The State alleged in its indictment that Szarf previously was convicted of family violence assault on October 11, 2006 in Cause No. 1407642 in County Criminal Court at Law No. 11 of Harris County, Texas. The trial court admitted a certified copy of the 2006 conviction of an Evan Michael Szarf into evidence as State Exhibit 10 (the "2006 Offense"). State Exhibit 10 states that a defendant named Evan Michael Szarf pleaded guilty on October 11, 2006 to "assault – family member." A certified copy of the charging instrument for the 2006 Offense, which occurred on October 4, 2006, was offered into evidence as State Exhibit 9. State Exhibit 9 states the assault was committed by Evan Michael Szarf, a white male with a date of birth of March 2, 1982, against a woman with whom he had a dating

26

relationship, by "strangling the complain[an]t with his hand" in Harris County, Texas. State Exhibits 9 and 10 involve the same defendant, cause number, offense, and court.

During the trial, Sergeant Guerrero testified that when he talked to Szarf on the day of the incident, Szarf told him his birthday was March 2, 1982. That is the same date of birth reflected in State Exhibit 9. Deputy Pizarro also testified that he was able to identify Szarf at the scene based on his name and date of birth, both of which match the name and date of birth on State Exhibit 9.

Szarf argues that the State did not satisfy its burden to prove beyond a reasonable doubt that a prior conviction exists and that he is connected to that prior conviction. He asserts that "[a] mere prior judgment bearing the same name as the defendant on trial is insufficient to show he was the same person actually convicted."[7] We agree that a name—or even a mere name and birthdate—is insufficient proof. "Clearly, we must not depend only on a name or even a name and a birth date" to link a defendant to a prior conviction. *Flowers*, 220 S.W.3d at 925 (Johnson, J., concurring).[8]

---

[7] Szarf concedes that if State Exhibit 10 "was properly proven beyond a reasonable doubt to be connected to [him], it would indeed suffice to enhance the indicted allegations from a third-degree to a second-degree felony."

[8] *See also Strehl v. State*, 486 S.W.3d 110, 114 (Tex. App.—Texarkana 2016, no pet.) ("Evidence that the defendant merely has the same name as the person previously convicted is not sufficient to satisfy the prosecution's burden.").

The State did not proffer testimony from an expert fingerprint analyst to compare and opine on the prints present on State Exhibit 10.[9] Nor did it offer testimony from a person who was present when Szarf was convicted of the prior offense and could identify Szarf as that person. There are also no photographs attached to State Exhibits 9 and 10, and Szarf did not stipulate to any evidence of connection or provide any admissions concerning the 2006 Offense. The State contends, however, that it offered more than a mere name and date of birth to satisfy its burden because in addition to State Exhibits 9 and 10, it also proffered evidence of a similar offense committed by Szarf in a nearby county in 2007. The State points to State Exhibit 7, a 2012 Probation Violation Report that pertains to an "Evan Michael Szarf" who was granted probation in 2010 for a 2007 charge of Assault-Family Violence.[10] The Probation Violation Report includes a photograph of Evan Michael Szarf.[11] The State notes that Szarf does not contend in his brief and did not contend at trial that he was not the Evan Michael Szarf identified in State Exhibit 7. While that may be the case, we agree with Szarf that State Exhibit

---

[9] There is a thumbprint on State Exhibit 10, but the thumbprint is illegible.

[10] State Exhibits 5, 6, 7, and 8 pertain to the enhancement allegation in Count 2 of the indictment and are not related to the enhancement allegations recited in Count 1. The case reflected in State Exhibit 7 is *State of Texas v. Evan Michael Szarf*, Cause No. 07-DCR-048432, in the 240th Judicial District Court of Fort Bend County, Texas. State Exhibits 5, 6, and 8 also pertain to that case. State Exhibit 5 is a judgment, State Exhibit 6 is a motion for adjudication of guilt, and State Exhibit 8 is the judgment adjudicating guilt.

[11] Szarf concedes that State Exhibit 7 contains his photograph.

7 is unrelated to the 2006 Offense alleged in the indictment and alone is insufficient to establish the requisite connection between Szarf and the 2006 Offense. *See Zimmer v. State*, 989 S.W.2d 48, 52 (Tex. App.—San Antonio 1998, pet. ref'd) (holding that State, in attempting to prove two prior DWI convictions, successfully proved one prior conviction, but that conviction did not link defendant to second DWI conviction of person with same name).

Nonetheless, we find that based on Szarf's unique name, the listing of his correct date of birth on State Exhibit 9, the identification of Szarf in the same exhibit as a white male, the type of assault committed, and the nearby county in which the prior assault was committed, the trial court could have found there was sufficient evidence to prove the prior conviction existed and that Szarf, a person with the same unique name, date of birth, gender, and race as the defendant in the 2006 Offense, was linked to the prior conviction.

The State asks this Court "to judicially notice that Washington County is within about 80 miles of Harris County." We do so.[12] *See Thacker v. State*, No. 08-18-00085-CR, 2020 WL 1303555 (Tex. App.—El Paso Mar. 19, 2020, pet. ref'd) (not designated for publication). In *Thacker v. State*, the State proffered evidence that the appellant's full name and birth date matched that of the person

---

[12]  We may take judicial notice of facts that are "notorious, well known, or easily ascertainable," such as the distance between two geographical locations. *Benton v. State*, 336 S.W.3d 355, 359 n.8 (Tex. App.—Texarkana 2011, pet. ref'd) (citations omitted).

29

identified in the prior conviction. *Id.* at \*12. The court of appeals found it "significant" that the prior conviction came from Alamance County and the appellant had lived in Burlington, North Carolina, part of which is in Alamance County. The court stated, "We find it unlikely that there would be more than one 'William Geoffrey Thacker' with the same birth date, residing in or near Alamance County, who could have been the subject of the prior conviction." *Id.*; *see also Brown v. State*, No. 06-19-00082-CR, 2019 WL 6334707, at \*5 (Tex. App.— Texarkana Nov. 27, 2019) (mem. op., not designated for publication) (observing that defendant was linked to prior conviction "by name, birth date, type of offense, and county of offense"), *rev'd on other grounds*, 618 S.W.3d 352 (Tex. Crim. App. 2021).

Viewing the evidence in the light most favorable to the State, we conclude sufficient evidence was presented linking Szarf to the prior crime of family violence assault. We hold that a rational trier of fact could have found beyond a reasonable doubt that (1) a prior conviction for family violence assault in Harris County Cause No. 1407642 existed and (2) legally sufficient evidence linked Szarf to that conviction. *See Orsag v. State*, 312 S.W.3d 105, 115 (Tex. App.–Houston [14th Dist.] 2010, pet. ref'd) (factfinder considers "totality of the evidence" to determine whether State proved prior conviction beyond reasonable doubt).

We overrule Szarf's second issue.

### 3. Reforming the Judgment[13]

Szarf asserts in his third and fourth issue that the trial court's final judgment incorrectly reflects the classification of the offenses for which he was charged. In Count 1, Szarf was charged with Occlusion Assault with Prior Offense, pursuant to Section 22.01(b-3) of the Penal Code, a second-degree felony. In Count 2, he was charged with Assault Family Member with Previous Conviction, pursuant to Section 22.01(b), a third-degree felony. The final judgments, however, recite the degrees of the crimes as first degree for Count 1, and second degree for Count 2.

The State concedes that the final judgments are incorrect with respect to both counts and should be reformed. The State concedes the final judgment for the Occlusion Assault conviction under Count 1 should be reformed to reflect the offense is a second-degree felony and the final judgment for Assault Family Member under Count 2 should be reformed to reflect the offense is a third-degree felony.

A review of the final judgments indicates Appellant is correct about the mistaken identification of the degree of the offenses. We thus sustain Szarf's third and fourth issues. Courts of appeals have the power to reform and correct judgments. *Harris v. State*, 670 S.W.2d 284, 285 (Tex. App.—Houston [1st Dist.] 1983, no pet.). Pursuant to such authority, we reform the final judgments of the

---

[13] The two judgments bear the same cause number. Therefore, we refer to them collectively.

trial court by changing the listed degree for Occlusion Assault under Count 1 to second-degree, and for Assault Family Member under Count 2 to third-degree.

## Conclusion

We affirm the trial court's judgment, as reformed.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Goodman, Landau, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).